UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

                Plaintiffs,

  v.

ACACIA MENTAL HEALTH CLINIC,
LLC, and ABE FREUND,

                Defendants.

Civil Action No. 16-cv-1718

**UNDER SEAL**

---

### *EX PARTE* APPLICATION FOR
### PREJUDGMENT REMEDIES AGAINST ABE FREUND
### PURSUANT TO THE FEDERAL DEBT COLLECTION PROCEDURES ACT

---

      In this application, the government seeks prejudgment remedies under the Federal Debt Collect Procedures Act, 28 U.S.C. § 3001 *et seq.*, against Defendant Abe Freund. As explained in the government's complaint, Defendant Acacia Mental Health Clinic, LLC, and its owner, Freund, obtained millions of dollars from the Wisconsin Medicaid program to which they were not entitled, in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. As relevant here, Freund caused Acacia to submit thousands of false claims for urine drug tests that misrepresented the type of tests performed by Acacia in order to improperly obtain higher reimbursement from Medicaid. He also caused Acacia to submit claims for telemedicine services provided by doctors located outside the United States, despite knowing that Medicaid prohibits reimbursement for such services.

      The United States seeks treble damages and civil penalties under the False Claims Act to hold Acacia and Freund accountable for their false claims to Medicaid. Freund, however, has engaged in financial transactions that have had the effect of hindering the government's ability to recover on its claims as well as fraudulent transfers of real estate to family members. Indeed,

Acacia has gone out of business, a bank recently initiated foreclosure proceedings on the former Acacia clinic building, and Freund contends that he has almost no assets other than the property at issue in this application. At the same time that Freund dissipated his assets, Freund also fraudulently transferred two properties to his family members after he backed out of a settlement in principal with the government. Indeed, Freund purported to sell a $785,000 home to his daughter and son-in-law, but in the months following the alleged sale Freund returned most of the sales proceeds to them in a series of large checks.

The government thus applies *ex parte* for prejudgment remedies Federal Debt Collection Procedures Act, namely writs of attachment (*i.e.*, liens) on certain real estate held by Freund and his family members to preserve the government's interest in those properties.

## **Standard for Prejudgment Remedies**

The Federal Debt Collect Procedures Act (FDCPA) provides the exclusive civil procedures for the United States to obtain a prejudgment remedy on a claim for debt. 28 U.S.C. § 3001(a)(2). Subchapter B of the FDCPA governs prejudgment remedies generally, and Subchapter D provides remedies in the context of fraudulent transfers. The government seeks remedies under both Subchapters in this matter.

First, the government seeks writs of attachment under Subchapter B against four properties owned by Freund in New York state. The government is entitled to such writs where it establishes: "(1) the probable validity of the claim for a debt; (2) the amount of the debt claimed; (3) that the debtor has or is about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States; (4) that it has satisfied all other statutory requirements; and (5) that the debtor has a substantial nonexempt interest in the property

2

against which a remedy is sought." *United States v. Berkeley Heartlab, Inc.*, 225 F.Supp.3d 460, 464 (D.S.C. 2016).

Second, the government also seeks writs of attachment pursuant to Subchapter D on two properties that Freund fraudulently transferred to his children and their spouses. As relevant here, a transfer is fraudulent as to a debt to the United States if the debtor makes the transfer with "the actual intent to hinder, delay, or defraud a creditor." 28 U.S.C. § 3304(b)(1)(A). The FDCPA enumerates several factors to determine "actual intent," including whether the transfer was made to an insider (such as his child), whether the debtor received reasonable value for the asset, and the timing of the transfer. *Id.* § 3304(b)(2). If the transfer is fraudulent, the government may avoid the transfer, obtain a remedy against the asset transferred or other property of the transferee, or obtain any other relief the circumstances require. *Id.* § 3306(a).

To establish its entitlement to these prejudgment remedies, the FDCPA requires that the government provide affidavits establishing with particularity facts supporting the probable validity of its claim for the debt and its right to the relief sought in the application. 28 U.S.C. § 3101(c). Here, the government provides the declarations of Special Agent Jennifer Bowers, Office of the Inspector General, Health and Human Services, and Michael Petron, Managing Director, Stout Risius Ross, LLC. The Court should consider the "totality of the circumstances" when evaluating whether the government established the probable validity of its claims. *United States ex rel. Doe v. DeGregorio*, 510 F.Supp.2d 877, 885 (M.D. Fla. 2007).

Finally, the Court may issue prejudgment relief on the basis of the government's *ex parte* application without waiting for a response from the debtor because of the speed with which the defendant may dispose of property. *See* 28 U.S.C. § 3004(c); *N.L.R.B. v. E.D.P. Medical*

3

Case 2:16-cv-01718-LA   Filed 04/23/18   Page 3 of 19   Document 25

*Computer Sys.*, 6 F.3d 951, 955-56 (2d Cir. 1993). If the Court grants the requested writs, Freund is thereafter entitled to request a hearing. 28 U.S.C. § 3101(d).

**Argument**

I. **The government is entitled to writs of attachment on four properties owned by Freund.**

Freund owns four properties in New York with a combined fair market value of approximately $1.8 million. *See* Petron Declaration ¶ 42 & Exhibit M. The government estimates that Freund has equity in these properties of approximately $1,000,000. *See id*. The government seeks liens on these four properties to protect its ability to recover on its claims in this matter. As explained below, the government can satisfy all the elements imposed by the FDCPA to obtain this relief.

   A. **The government has established the probable validity of its claim for a debt because the evidence strongly demonstrates that Freund violated the False Claims Act.**

The FDCPA first requires the government to demonstrate "the probable validity of the claim for a debt." 28 U.S.C. § 3101(c)(1); *see also Berkeley Heartlab*, 225 F.Supp.3d at 464. Here, the government has strong evidence that Freund violated the False Claims Act, thereby establishing the probable validity of its claim for a debt.

As an initial matter, a claim under the False Claims Act for treble damages and civil penalties constitutes a "claim for a debt" within the meaning of the FDCPA. *See, e.g., Berkeley Heartlab*, 225 F.Supp.3d at 466-67; *DeGregorio*, 510 F.Supp.2d at 883-884. The government asserts that Freund knowingly caused the submission of false claims for payment to Wisconsin Medicaid and knowingly made false records or statements material to false or fraudulent claims submitted to Wisconsin Medicaid, in violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). *See*

Complaint, ECF 1 at ¶¶ 138-142. As relevant here, the government alleges that Freund knowingly engaged in two fraudulent schemes to submit false claims to Medicaid.

### i. Freund caused the submission of false claims related to urine drug screens.

First, Freund caused Acacia to submit thousands of false claims that misrepresented the type of urine drug tests Acacia performed from January 1, 2011 through October 31, 2012 in order to improperly obtain higher reimbursement from Medicaid.[1]

Although he has no medical training or expertise, Freund established a policy that required every Acacia patient to undergo urine drug testing at each appointment with a physician or nurse practitioner, even when the medical staff did not believe that such testing was necessary. *See* Bowers Declaration ¶¶ 7-8. From January 1, 2011 through October 31, 2012, Acacia performed these urine drug tests with point-of-care cups. *Id.* ¶ 9. A point-of-care cup is a relatively simple device that can detect the presence or absence of one or more drug classes, but cannot identify the specific drugs or drug quantities in the patient's urine. *Id.* ¶ 10. At Acacia, staff members without any toxicology or laboratory expertise administered and read the results of the point-of-care cups. *Id.* Acacia used point-of-care cups that could detect multiple drug classes in a single test, which are referred to in the industry as "multiplexed" cups. *Id.* Acacia typically paid its supplier between $5 and $6 per cup. *Id.* ¶ 11.

When medical providers bill services to Wisconsin Medicaid, they use numeric codes assigned to the services by either the American Medical Association (called Current Procedural

---

[1] Acacia and Freund submitted additional false claims for medically unnecessary and duplicative urine drug screens from November 1, 2012 through December 31, 2014. *See* Complaint, ECF 1. For purposes of this application, the government focuses on the false claims submitted for urine drug screens from January 1, 2011 through October 31, 2012 because the dollar amount of those claims is more than sufficient to support the prejudgment remedies sought at this time. The government reserves its right to seek additional prejudgment remedies on the basis of the later-in-time false claims for urine drug screens.

5

Terminology (CPT) codes) or the Centers for Medicare and Medicaid Services (called Healthcare Common Procedural Coding System (HCPCS) codes). *See* Wis. Admin. Code DHS § 106.03(2)(a). During 2011 and 2012, these coding systems required providers to bill for urine drug tests performed with point-of-care, multiplexed cups using CPT code 80104 or HCPCS code G0434. *See* Bowers Declaration ¶ 14. Wisconsin Medicaid reimbursed providers about $20 per test under CPT code 80104 or HCPCS code G0434. *Id.* ¶ 15.

Rather than accurately bill Medicaid using CPT code 80104 or HCPCS code G0434, Acacia billed for urine drug tests performed with point-of-care, multiplexed cups using CPT code 80101. *Id.* ¶ 17. CPT code 80101, however, applied only to tests performed using a "single drug class method," *i.e.*, methodologies that detected only a single drug class per test, such as laboratory analyzers that use immunoassay to detect a specific drug class. *Id.* ¶ 16. CPT code 80101 thus did not apply to Acacia's point-of-care cups that detected multiple drug classes in a single test. In fact, the AMA issued a specific directive stating that CPT code 80101 excluded "multiplexed screening kits for multiple drugs or drug classes" like the point-of-care cups used by Acacia. *Id.*

Acacia obtained a significant amount of additional reimbursement from Medicaid as a result of its improper use of CPT code 80101. Because CPT code 80101 covers tests that detect a single drug class per procedure, providers may bill one unit of that code for each drug class tested. For example, if the clinic uses a methodology covered by CPT code 80101 to test a patient for 14 drug classes, it can bill 14 units of CPT code 80101. Acacia took advantage of the ability to bill multiple units of CPT code 80101 and routinely billed Medicaid for 12 to 14 units of that code, thereby obtaining reimbursement of $220 to $250 per test rather than the $20 per test it should have received if it accurately described the point-of-care cups using CPT code 80104 or HCPCS code G0434. *See* Bowers Declaration ¶ 17.

6

Freund was responsible for Acacia's use of CPT code 80101 and was aware that it was improper. Malkah Wajchman, Acacia's office manager, explained that she worked with Freund to determine how to code and bill services to insurance. *Id*. ¶ 18. Although commonly used in the healthcare industry, Ms. Wajchman admitted that they did not have a copy of the AMA's CPT coding manual to assist their coding decisions because Freund decided they did not need one. *Id.* Ms. Wajchman also explained that three health maintain organizations (HMOs) informed Freund that it was not proper for Acacia to bill for urine drug tests performed with point-of-care, multiplexed cups under CPT code 80101. *Id*. ¶ 19. These HMOs were operating under a contract with the state of Wisconsin to provide benefits to Medicaid members, but Wajchman does not recall contacting Medicaid to determine whether use of CPT code 80101 was appropriate. *Id.* In any event, Acacia continued to use CPT code 80101 to bill Medicaid despite the HMOs' warnings that it was not appropriate. *Id.*

Freund also lied to Wisconsin regulators to ensure that Acacia could continue to submit its false claims under CPT code 80101. Specifically, in the fall of 2011, Wisconsin Medicaid began to check claims for urine drug tests against each provider's level of certification under the Clinical Laboratory Improvements Act (CLIA). *See* Bowers Declaration ¶ 20. At that time, Acacia had a CLIA certificate of waiver, which only allowed Acacia to perform very simple tests. *Id.* To bill for more complex tests, including the types of tests covered by CPT code 80101, a provider must have a higher level CLIA certification. Wisconsin Medicaid thus started to deny Acacia's claims submitted with CPT code 80101. *Id.* In order to regain the ability to bill under CPT code 80101, Freund applied for a higher level of CLIA certification with the Wisconsin Department of Health Services (which administers both Medicaid and CLIA). *Id.* ¶ 21. In the application, Freund misrepresented the types of tests Acacia intended to perform, falsely stating that it would not

perform simple tests of the type authorized by its existing CLIA certificate of waiver.  *Id.*  The application materials also falsely stated that Acacia operated laboratory analyzer equipment that it did not, in fact, own or operate.  *Id.*  Based on these misrepresentations, Acacia obtained a higher CLIA certification in January 2012.  *Id.* ¶ 22.  Acacia thereafter resumed its improper billings to Medicaid under CPT code 80101 for urine drug tests performed with point-of-care, multiplexed cups.  *Id.* ¶ 23.  Acacia continued to submit these false claims until the end of October 2012, when it finally obtained a (different) analyzer and stopped billing for point-of-care cups under CPT code 80101.  *Id.*

In sum, the evidence demonstrates the "probable validity" of the government's claim against Freund for the submission of false claims to Wisconsin Medicaid for urine drug screens from January 1, 2011 through October 31, 2012.  *See DeGregorio*, 510 F.Supp.2d at 887-888 (government established probable validity of claim against owner of laboratory because evidence showed that owner was involved in falsely coding claims submitted to Medicare).

### ii. Freund caused the submission of false claims related to telemedicine services provided by psychiatrists located outside the United States.

Second, Freund also caused Acacia to submit thousands of false claims to Wisconsin Medicaid from June 1, 2011 through December 31, 2014 for telemedicine services rendered by two psychiatrists located outside the United States even though Freund knew that Medicaid prohibited payment for such services.

Telemedicine, also known as telehealth, is the provision of healthcare services by a Medicaid-enrolled provider at a remote location to a patient at an originating site via interactive video and audio.  *See* Wis. Stat. § 49.45(29w)(b)(1)(b).  The Affordable Care Act prohibited payment by any state Medicaid program to mental health telemedicine providers located outside the United States, and in accordance with the ACA, Wisconsin amended its Medicaid statute to

prohibit payment to any mental health telemedicine provider located outside the United States. Wis. Stat. § 45.49(29w)(b)(2)(c). This prohibition became effective on June 1, 2011, and Wisconsin Medicaid notified providers, including Acacia, of the prohibition through its online portal system. Acacia's clinic manager, David Dropkin, was aware of the prohibition by May 19, 2011 at the latest. Bowers Declaration ¶ 25.

Notwithstanding these statutory prohibitions, Acacia regularly had its patients receive telemedicine psychiatry services provided by two physicians, Drs. Isaac Nagel and Matthew Medwick, who were located in Israel. Based on review of customs records showing entry and exit from the United States as well as Acacia's Medicaid billings, the government determined that Acacia obtained nearly $400,000 in reimbursement from Wisconsin Medicaid for telemedicine services provided by Dr. Nagel while he was in Israel between July 1, 2011 and December 31, 2014. Bowers Declaration ¶¶ 26-29. Likewise, Acacia received over $60,000 in reimbursement from Wisconsin Medicaid for telemedicine services provided by Dr. Medwick while he was in Israel between July 1, 2011 and December 31, 2014. *Id.* ¶ 30-31.

Freund knew that Drs. Nagel and Medwick provided these telemedicine services from Israel. Bowers Declaration ¶ 32. Freund also knew that Medicaid prohibited payment for telemedicine services rendered by mental health providers located outside the United States. Indeed, an auditor from the Wisconsin Department of Health Services told Freund in July 2012 that the Department had not approved Acacia's use of telemedicine providers located outside the United States. *Id.* ¶ 33. The auditor also told Freund that he needed to obtain approval to continue that practice, but Freund never obtained such approval. *Id.* Likewise, Optum Health, which operated a health maintenance organization that contracted with Wisconsin Medicaid to provide benefits to certain Medicaid beneficiaries, explicitly informed Freund that Medicaid prohibited

payment for telemedicine services rendered by Dr. Nagel because he was located outside the United States. *Id*. ¶ 34. Freund, however, continued to have Acacia bill traditional Medicaid for telemedicine services rendered by Drs. Nagel and Medwick from Israel. *Id.*

Acacia and Freund also attempted to hide the fact that Drs. Nagel and Medwick were located in Israel. For example, in their applications to become enrolled as Medicaid providers, they listed Acacia's office as the doctors' office location, even though they primarily rendered services from Israel. Bowers Declaration ¶ 35. Likewise, Acacia and Freund also hid the fact that Drs. Nagel and Medwick were performing services through telemedicine. They routinely failed to include a required billing code modifier on claims to Medicaid that would have informed Medicaid that Drs. Nagel and Medwick were performing services through telemedicine (without the modifier, it appeared to Medicaid that they were rendering services in-person at Acacia's office). *Id.*

In sum, the government's evidence demonstrates the "probable validity" of its False Claims Act claims against Freund for false claims related to telemedicine services.

### B. The amount of the debt Freund owes is at least $3.36 million in treble damages and $67.7 million in civil penalties

The FDCPA next requires the government to establish the amount of the debt claimed by the government. 28 U.S.C. § 3101(c)(2)(A). The statute, however, does not require an itemized accounting of the debt. *Berkeley Heartlabs*, 225 F.Supp.3d at 469. Instead, the government may satisfy its burden through affidavits showing the estimated recovery it would obtain on its False Claims Act claims. *Id.*

Here, Freund caused Acacia to submit 2,699 false claims for urine drug screens improperly billed under CPT code 80101 from January 1, 2011 through October 31, 2012. Bowers Declaration ¶ 36. Acacia and Freund thus improperly obtained $668,111.04 from Wisconsin Medicaid. *Id.*

10

Under the False Claims Act, the government is entitled to treble damages, for a total of $2,004,333.12 on these claims. The government is also entitled to a civil penalty of between $5,500 and $11,000 for each of the 2,699 false claims, for a minimum total of $14,844,500.

Likewise, Freund caused Acacia to submit 9,616 false claims for telemedicine services rendered by providers located outside the United States from June 1, 2011 through December 31, 2014. Bowers Declaration ¶ 37. Acacia and Freund improperly obtained $453,080.35 from Wisconsin Medicaid on these claims. *Id.* The government is thus entitled to treble damages of $1,359,241.05 on these claims. It is also entitled to a minimum civil penalty of $52,888,000 on the telemedicine false claims.

In sum, the amount of the debt owed to the United States is at least $3.36 million in treble damages and $67.7 million in civil penalties. The debt owed to the United States thus greatly exceeds the value of the properties that the government seeks to attach. The properties owned by Freund have a fair market value of $1.8 million. Petron Declaration ¶ 42 & Exhibit M. The properties that Freund fraudulently transferred to his daughters and sons-in-law (*see infra* at Section II) have a fair market value of $1.11 million. *Id*. ¶¶ 21 & 24.

### C. Freund disposed of property with the effect of hindering the United States.

To obtain writs of attachment against Freund's properties, the government next must show that there is "reasonable cause to believe" that Freund has or is about to assign, dispose of, or encumber with debt his property "with the effect of hindering, delaying, or defrauding" the United States. 28 U.S.C. §§ 3101(b)(1)(B) & (C). The FDCA does not require the government to prove that Freund intended to conceal or convert assets in order to obtain a prejudgment remedy on property he owns. *Berkeley Heartlab*, 225 F.Supp.3d at 470. As one district court explained, the FDCA "does not require the Government to show that a debtor's actions are fraudulent or

11

secretive." *United States v. Teeven*, 862 F.Supp. 1200, 1214 n.12 (D. Del. 1992). "Rather, the Government must provide the Court with a reasonable cause to believe that the Defendants have or are about to take actions with regard to their properties that would have the effect of hindering, delaying, or defrauding the United States. The statute contains no intent requirement." *Id.* (quotations omitted).

Freund has engaged in numerous financial transactions since learning of the government's investigation that have the effect of hindering the government's ability to recover in this matter. At the latest, Freund became aware of the government's investigation of his false claims when the Office of Inspector General, Health and Human Services, served Freund with a subpoena on July 2, 2013. *See* Bowers Declaration ¶ 39. Following service of that subpoena, representatives of the government and Freund met several times in 2014, and the government made plain its view that Freund defrauded Medicaid. *Id.* ¶ 40. In early 2015, moreover, the parties engaged in mediation, during which Acacia and Freund agreed to a settlement in principle of the government's claims. *Id.* ¶ 41. Following the mediation, however, Freund and Acacia repudiated the settlement in principle. *Id.* ¶ 42.[2]

Freund and Acacia earned substantial income after they became aware of the government's claims. Freund earned gross income of about $2.5 million in 2013, over $3 million in 2014, and

---

[2] Evidence of Freund's repudiation of the settlement in principle is not barred by Federal Rule of Evidence 408 because the government does not offer that evidence to prove the validity or amount of any claim. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 294 (7th Cir. 1999) ("The parties' prior negotiations resulted in an agreement which was subsequently repudiated by Starter, giving rise to the instant case. Thus, if anything, permitting Starter to exclude the settlement evidence on Rule 408 grounds would flout the policy of promoting compromises under the Rule. Therefore, we find that the district court did not abuse its discretion in admitting the settlement evidence under the "another purpose" exception to Rule 408.").

nearly $900,000 in 2015.[3]  *See* Petron Declaration ¶ 7.  Similarly, Acacia had gross revenues of $8 million in 2014 and $4.4 million in 2015.[4]  *Id.* ¶ 8.  Despite these large incomes, Freund currently has almost no liquid assets.  *Id.* ¶ 9.  Indeed, he has represented to the government that he has only about $8,000 in various bank and investment accounts.  *Id.*

Where did the money go?  The government does not have a complete answer to that question, which, of course, is part of the reason why the government seeks prejudgment remedies against Freund's properties to ensure that some assets will be available to satisfy any judgment in the matter.  The available evidence demonstrates that Freund has dissipated, transferred, and potentially concealed his assets, all with the effect of hindering the government's ability to recover.

First, Freund gave millions of dollars to charities after he became aware of the government's investigation, including about $2.8 million in 2014, $1.1 million in 2015, and $180,000 in 2016.  Petron Declaration ¶ 10.  For example, he provided over $800,000 to a single organization, which primarily operates outside the United States, after he learned of the government's claims.  *Id.* at ¶ 11.  Second, Freund caused Acacia to cease operations in 2017.  *Id*. ¶ 13.  Freund then sold Acacia's urine drug testing equipment (which Freund valued at over $300,000) to a business operated by his son, yet he has not accounted for the proceeds of that sale.  *Id.* ¶ 14.  Third, he established a successor business to Acacia called Achievement Associates, which operates a mental health clinic at the same location as Acacia formerly operated.  *Id.* ¶ 17.  Freund, however, sold that business in 2017 – after the government initiated this lawsuit – to his son-in-law for only $100,000.  *Id*. ¶ 18.  The sales price of Achievement Associates is a pittance given Acacia's former revenues, and, in any event, Freund has not accounted for the funds received

---

[3] Freund has not yet filed tax returns for 2016 or 2017, and the government is unaware of his income for those years.

[4] Acacia has not yet filed tax returns for 2016 or 2017, and the government is unaware of its revenues for those years.

from the sale of Achievement Associates. *Id.* ¶ 19. Finally, Freund has represented to the government that he currently has no employment or business income. *Id.* ¶ 12. In sum, since he received notice of the government's claims, Freund appears to have dissipated almost all of his (ill-gotten) income and business assets. What assets remain, such as the proceeds of his sale of Acacia's lab equipment or his sale of Achievement Associates, moreover, cannot be accounted for, raising the potential that Freund is concealing assets.

Freund has also made several real estate transactions that have the effect of hindering the government's ability to recover in this matter. First, he transferred two properties to his children and their spouses for well below their fair market value. Petron Declaration ¶¶ 20-26. As discussed *infra* at Section II, the government believes that these transfers were fraudulent within the meaning of the FDCPA, and it seeks to set aside the transfers and obtain writs of attachment against those properties under Subchapter D of the FDCPA. Freund also encumbered the Acacia clinic building with a mortgage after he had notice of the government's investigation, even though he had owned it for years. *Id.* ¶ 15. Freund received at least $750,000 when he mortgaged the clinic building, but he has not accounted for those funds. Freund also defaulted on the mortgage, and the lender recently initiated foreclosure proceedings in Wisconsin state court. *Id.* ¶ 16.

In light of his disposition and transfer of his assets, the Court will likely be unsurprised that Freund has represented to the government that he lacks the ability to pay the damages in this case. The Court should thus grant the prejudgment relief requested by the government to ensure that there will be at least something left for the government to recover at the end of this lawsuit.

### D. Freund has substantial nonexempt interests in the four New York properties.

The FDCPA authorizes writs of attachment against any "property in the possession, custody, or control of the debtor and in which the debtor has a substantial nonexempt interest." 28

14

U.S.C. § 3102(a)(1). "Property" includes "any present or future interest, whether legal or equitable," in real property, "wherever located and however held." 28 U.S.C. § 3002(12). A writ of attachment serves as a lien upon property subject to the writ and does not entitle the United States to sell the property until further order of the Court. *See* 28 U.S.C. §§ 3102(d)(1) & (f)(1). The lien, however, preserves the government's interest in the property and gives notice to creditors for the duration of this action. *Id.* The government attached to this application proposed writs of attachment as well as proposed notices for service on Freund and his family members concerning their rights for a hearing if the writs are issued.

Freund has substantial, nonexempt interests in the four New York properties for which the government seeks writs of attachment. To determine whether a debtor possesses a substantial, nonexempt interest in property under the FDCPA, the courts look to the law of the state in which the property is located. *Berkeley Heartlab*, 225 F.Supp.3d at 471 (citing *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010)). Accordingly, New York state law controls in this matter.

- First, Freund is the sole owner of record of the property located at 159 Acres Road, Unit 204, Monroe, Orange County, New York. The government understands that Freund resides at this home with his wife. Under New York law, Freund has a $125,000 homestead exemption in this property. NY CPLR § 5206 (providing for $125,000 exemption for homesteads in Orange County). In other words, Freund can avoid the government's lien up to the first $125,000. *See Levinson v. R&E Property Corp.*, 395 B.R. 554, 557-558 (Bankr. E.D.N.Y. 2008) (holding that husband could invoke New York homestead exemption on residence he shared with his wife to avoid lien up to the amount of the homestead exemption). Freund has equity in this property of at least $266,575. With application of the homestead exemption, the government's lien is approximately $141,575. *See* Petron Declaration ¶¶ 27-30.

- Second, Freund is the sole owner of record of the properties located at 166 Acres Road, Unit 101, Monroe, Orange County, New York, and 6 Lemberg Road, Unit 206, Monroe, Orange County, New York. The government understands that these are rental properties and is not aware of any applicable exemptions. Freund has equity in the 166 Acres Road property of at least $305,131 and equity in the 6 Lemberg Road property of at least $197,082. *See* Petron Declaration ¶¶ 31-38.

15

- Finally, Freund and his son-in-law own the property located at 8 Blue Bird Road, Monsey, New York 10952. Freund and his son-in-law own this property as tenants in common. Under New York law, Freund thus possesses a one-half ownership interest in the property. 24 N.Y. Jur. 2d Cotenancy and Partition § 7. The total equity in this property is at least $269,779. *See* Petron Declaration ¶¶ 39-41.

In sum, Freund has substantial, nonexempt interests in the four New York properties at issue. The Court should issue the writs of attachment.

## II. The government is also entitled to writs of attachment on two properties that Freund fraudulently transferred to his family members under Subchapter D of the FDCPA.

The government also seeks to avoid Freund's transfers of two properties to his children and their spouses, and to obtain writs of attachment on those properties, because the transfers were fraudulent within the meaning of the FDCPA.

A transfer "is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made . . . if the debtor makes the transfer . . . with actual intent to hinder, delay, or defraud a creditor." 28 U.S.C. § 3304(b)(1)(A). To determine "actual intent," the Court should consider a number of factors, including whether:

(A) <u>the transfer was made to an insider</u>;
(B) the debtor retained possession or control of the property transferred after the transfer;
(C) the transfer or obligation was disclosed or concealed;
(D) <u>before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit</u>;
(E) the transfer was of substantially all the debtor's assets;
(F) the debtor absconded;
(G) the debtor removed or concealed assets;
(H) <u>the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred</u>;
(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(J) <u>the transfer occurred shortly before or shortly after a substantial debt was incurred</u>; and
(K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

16

28 U.S.C. § 3304(b)(2) (emphasis added). After the government establishes that a transfer was fraudulent, the government may obtain: (1) avoidance of the transfer to the extent necessary to satisfy the debt to the United States; (2) a remedy against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require. 28 U.S.C. § 3306(a).

Here, Freund fraudulently conveyed two properties to his family members since he received notice of the government's investigation and claims against him. Most egregiously, on January 29, 2016, Freund purported to sell the property located at 242 Mountainview Drive, Monroe, New York to his daughter and son-in-law, Faigy and Joel Jacobowitz.[5] *See* Petron Declaration ¶ 24. As noted, prior to this date, Freund and the government had engaged in substantial settlement discussions, including a mediation in April 2015 during which Freund had agreed in principle to a settlement, only to back out subsequently. Bower Declaration ¶¶ 40-42. And although Freund concedes that fair market value of the property was $785,000 at the time of the sale, Freund gifted his daughter and son-in-law $160,000 to reduce the sale price to the well-below market value of $625,000. Petron Declaration ¶ 24. In the months following the closing, moreover, Freund and his wife returned most of the proceeds from the sale to his daughter and son-in-law in a series of large checks that totaled $480,000. *Id.* ¶ 25. Freund thus received, at most, $145,000 for this property from his daughter and son-in-law. *Id.* ¶ 26.

In light of these circumstances, Freund plainly made the transfer of the Mountainview Drive property with the "actual intent" to hinder the government's recovery. The transaction involved "insiders" because the FDCPA defines insiders to include relatives such as his daughter.

---

[5] Although the property is titled only in the son-in-law's name, New York's marital property law provides that both Freund's daughter and son-in-law have ownership interests in the property. *See Marshall v. Marshall*, 91 A.D.3d 610, 611 (App. Div. 2012) (explaining that marital property includes "all property acquired by either or both spouses during the marriage . . . regardless of the form in which title is held").

*See* 28 U.S.C. §§ 3304(b)(2)(A) & 3301(5). Freund's intent to hinder the government is further shown by the facts that he sold the property for well-below market value and then returned most of the purchase money to his daughter and son-in-law. *See* 28 U.S.C. § 3304(b)(2)(H). The timing of the transfer also demonstrates Freund's actual intent to hinder the government. Specifically, Freund made the transfer after the government had threatened suit and engaged in substantial settlement negotiations. *See* 28 U.S.C. § 3304(b)(2)(D) & (J).

Similarly, on August 4, 2015, Freund also fraudulently transferred property located at 166 Acres Road, Unit 302B, Monroe, New York, to another daughter and son-in-law, Brucha and Joel Goldberger. Petron Declaration ¶ 21. Again, the timing of this transaction – shortly after Freund backed out of a settlement in principle with the government – shows that Freund had actual intent to hinder the government. *See* 28 U.S.C. § 3304(b)(2)(D) & (J). Again, Freund transferred the property to an "insider," his daughter. *See* 28 U.S.C. §§ 3304(b)(2)(A) & 3301(5). And, again, Freund failed to receive reasonable value for the property. *See* 28 U.S.C. § 3304(b)(2)(H). Specifically, he claims he received $212,988 for this property, which was well below its market value of $325,000 or even the $315,000 Freund had paid for the house four years earlier. *See* Petron Declaration ¶¶ 20-21. Freund's bank account records, moreover, do not show any deposits corresponding with the $212,988 he purported received for the property. *Id.* ¶ 22. The government thus questions whether he even received it.

In sum, the Court should issue writs of attachment against the Mountainview Drive and Acres Roads properties that Freund purported to transfer to his daughters and sons-in-law because those transfers were fraudulent within the meaning of the FDCPA. *See Berkeley Heartlab*, 225 F.Supp.3d at 473-74 (issuing writs of attachment against properties because the defendant had

18

fraudulently transferred them to insiders for less than reasonable value after he became aware of the government's investigation).

## Conclusion

Freund bilked the government out of millions of dollars and then disposed of most of his ill-gotten gains. In order to ensure that the government may obtain some recovery from Freund for his fraud, the Court should issue the requested writs of attachment to protect its interests in the real property at issue.

Dated this 6th day of April, 2018.

        MATTHEW D. KRUEGER
        United States Attorney

By:   /s/ Michael A. Carter

        MICHAEL A. CARTER
        Assistant United States Attorney
        Eastern District of Wisconsin
        State Bar No. 1090041
        517 East Wisconsin Avenue
        Milwaukee, WI 53202
        (414) 297-4101
        Fax: (414) 297-4394
        Michael.A.Carter@usdoj.gov